02-09-278-CR PDR









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00278-CR

 

 


 
 
 Kody William Farmer
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM County
Criminal Court No. 9 OF Tarrant COUNTY

----------

 

MEMORANDUM OPINION[1] ON STATE’S PETITION
FOR

DISCRETIONARY REVIEW

----------

          

After
reviewing the State’s petition for discretionary review, we withdraw our February
17, 2011 opinion and judgment and substitute the following.  See Tex. R.
App. P. 50.

I. 
Introduction

          In
one point, Appellant Kody William Farmer appeals his conviction for driving
while intoxicated (DWI).  We reverse and remand for a new trial.

II. 
Factual and Procedural History

          This
is the case of the mistaken pill.

          Around
8:00 a.m. on April 19, 2008, Farmer rear-ended Randall Cox’s vehicle on Interstate
35.  After both drivers moved to the shoulder and exited their vehicles, Cox
noted that Farmer had difficulty walking around his vehicle—staggering and
weaving—and he slurred his words, although Cox could not smell any alcohol on
him.  Cox asked Farmer for his insurance information, and Farmer gave him a
business card.  Cox returned to his vehicle and called 911 because he did not
think it was safe for anyone in Farmer’s condition to be driving.  While Cox was
on the phone, Farmer returned to his vehicle and drove away.

          Cox
followed Farmer, and when he reached the top of the exit ramp, he saw Farmer’s
vehicle at the corner of the service road and an intersecting street; it was impaled
on a post.  The vehicle’s engine was running, the backup lights were on, and
the wheels were slowly turning in reverse.  Although the door was open, Farmer
was still inside.  The airbag had not deployed, there was no blood or shattered
glass, and Farmer did not appear injured, but he was not responding to the
OnStar service representative’s inquiries.

          Fort
Worth Police Officer Timothy Lee, the first officer on the scene, stated that
he neither smelled alcohol nor suspected that Farmer had been drinking before
the accident.  Rather, he believed that Farmer was intoxicated from something
other than alcohol because Farmer appeared sluggish and had slurred speech, an
unsteady walk, and difficulty keeping his eyes open.  Officer Lee testified
that Farmer shook his hand, and when he let go, Farmer fell towards him.  The
officer had to catch him to keep him from falling down, and he put Farmer in
his patrol vehicle because he feared Farmer might injure himself by falling.  Most
of Farmer’s answers to Officer Lee’s questions were unclear, and he had a difficult
time understanding Farmer’s speech.  Farmer was very cooperative and consented
to a blood draw at the hospital.  Inside Farmer’s vehicle, Officer Lee found a
bag containing three prescription bottles:  Tramadol HCL, Zolpidem, and
Carisoprodol.  He also found several blister packs of Benadryl, Amatrix, and
Celebrex.

          Detective
D.M. Carabajal assisted Officer Lee with the DWI investigation.  Detective Carabajal
testified that Farmer had slurred speech, slow movements, and appeared “out of
it,” and that Farmer told Detective Carabajal that he had not consumed alcohol.
 Detective Carabajal did not detect any odor of alcohol.  He suspected that
Farmer was under the influence of a drug.  In response to questioning, Farmer
initially indicated that he had taken some Benadryl but later stated that he
had taken some Soma and Ultram.[2]  Detective
Carabajal administered field sobriety tests to Farmer.  Although Farmer only
displayed two of the possible six clues on the horizontal gaze nystagmus test, he
had a hard time keeping his eyes open and keeping his balance during testing,
and he failed both the one-leg-stand and walk-and-turn tests.

          At
the hospital Farmer told Sandra Enriquez, the nurse who performed the blood
draw, that he was taking two prescription drugs, Soma and Ultram.  The blood
test revealed that Farmer’s blood contained 127 nanograms of Ultram per
milliliter of blood and 185 nanograms of Ambien per milliliter of blood.  These
levels were within the range of what one would expect somebody to have if they
had taken the commonly prescribed amounts of these drugs within a few hours of
the time of the blood draw.  Enriquez stated that at the time of the blood
draw, Farmer’s pupils were very large, almost black and that Ambien can cause
this side effect.  He also had slurred speech and could barely hold himself up
in the chair.

          Ambien,
which is taken for insomnia, is a prescription drug and a controlled substance.[3]  Dr.
Angela Springfield, chief toxicologist for the Tarrant County Medical Examiner’s
Office, testified that someone who took Ambien would have considerable
difficulty going about his daily functions, would not be as aware of his
surroundings, might be confused, and might have difficulty driving because the
effects of Ambien and alcohol are similar in many respects.  Ambien’s
recommended dosage usually induces sleep within fifteen to thirty minutes.

          Ultram
is also a prescription drug and a dangerous drug; it is a synthetic opiate that
is prescribed for pain and that causes drowsiness, dizziness, and sleepiness.  Mixing
Ultram with Ambien would increase the effects of drowsiness.  Ultram and Ambien
are both white pills with the same shape, but one is slightly larger than the
other.  Soma is also a white pill, but an Ambien pill is smaller than a Soma
pill.

          Farmer
testified that he had suffered from chronic back pain due to a work-related
injury and that he had taken different pain medications on and off for ten
years.  He also testified that four days prior to the accident, he was
prescribed Soma to control muscle spasms and was given his first prescription
for Ambien to help him sleep.[4]  He
had taken Ultram, on and off, for seven years.  Farmer woke up aching almost
every morning and usually took Ultram.  The labels on both Soma and Ultram warn
that they may cause drowsiness, and both his doctor and his pharmacist
recommended that he be within minutes of going to bed before taking Ambien.  Farmer
does not like taking medication at all, so his wife sets the pills out for him
and tries to make sure that he takes them.  She puts them on top of the
microwave, and he grabs them.

          Farmer
did not remember taking any medications the morning of the two accidents, but he
admitted that he obviously had.  Usually, if he was commuting from Aledo to Carrollton
for work, he would take Ultram before getting in the shower, and sometimes
Soma.  Farmer said that he took Ultram that morning and “I guess Soma.  I
thought—is what I thought I was taking.”

          The
last thing Farmer remembered before the accident was stopping at the gas
station down the road from his house, about twenty miles from where the first
accident occurred.  Based on the way he appeared in the video from Officer
Lee’s vehicle, Farmer agreed that he did not have the normal use of his mental
or physical faculties.  And based on the blood test results, he believed his
condition was caused by the Ambien.  He stated that he did not intentionally
take Ambien that morning and that he had never taken it since.

          Kimberly,
Farmer’s wife, testified that she was afraid Farmer would not take his
medication, and because the doctor had stressed how important it was for him to
take his pills, she laid them out on top of the microwave daily so she would
know that he took them.  That morning, she laid out his pills on top of the
microwave, separating the Ultram from the Ambien.  She did not remember seeing
him take the medication that morning, but she remembered it was gone and was
certain he had taken both pills because the Ambien she had laid out for that
night was gone.

          At
the close of testimony, the trial court noted that the issue of voluntariness
had been raised, but it denied Farmer’s requested instruction on the issue.  The
jury found Farmer guilty of DWI, and the trial court sentenced Farmer to ninety
days’ confinement, suspended for one year, and a $200 fine, and it placed him
on community supervision for a year.  This appeal followed.

III. 
Voluntary Act

          In
his sole point, Farmer argues that the trial court erred by denying his request
for a jury instruction on whether he committed a “voluntary act.”  He requested
the following instruction:

A person commits an
offense only if he voluntarily engages in conduct, including an act, or
omission.  Conduct is not rendered involuntary merely because the person did not
intend the results of his conduct.  Therefore, if you believe from the evidence
beyond a reasonable doubt that the defendant . . . did not have the normal use
of his mental or physical faculties by reason of the introduction of a
controlled substance to-wit:  zolpidem, tramadol, or a combination of two or
more of these substances, but you further believe from the evidence, or have a
reasonable doubt thereof, that [he] . . . took these drugs by accident, and it
was not the voluntary act or conduct of the defendant, you will acquit the
defendant and say by your verdict “not guilty.”


          You are instructed that involuntary intoxication by prescription
medication, or medications, is a defense to prosecution for an offense when it
is shown that the accused has exercised no independent judgment or volition in
taking the intoxicant; and as a result of his intoxication he did not know that
his conduct was wrong or was incapable of conforming his conduct to the
requirements of the law he allegedly violated.  [Emphasis added.]

 

A.  Standard
of Review

          Appellate
review of error in a jury charge involves a two-step process.  Abdnor v.
State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); see also Sakil v.
State, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).  Initially, we must
determine whether error occurred.  If so, we must then evaluate whether
sufficient harm resulted from the error to require reversal.  Abdnor,
871 S.W.2d at 731–32.  When the evidence raises the issue of the conduct of the
defendant not being voluntary, the jury must be charged, when requested, on the
issue of voluntariness.  Brown v. State, 955 S.W.2d 276, 280 (Tex. Crim.
App. 1997).  Failure to give the instruction is subject to a harm analysis.  Payne
v. State, 11 S.W.3d 231, 232–33 (Tex. Crim. App. 2000).

          Error
in the charge, if timely objected to in the trial court, requires reversal if
the error was “calculated to injure the rights of [the] defendant,” which means
no more than that there must be some harm to the accused from the error.  Tex.
Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); Abdnor, 871 S.W.2d at
731–32; Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)
(op. on reh’g); see also Barrios v. State, 283 S.W.3d 348, 350 (Tex.
Crim. App. 2009) (“A claim of jury-charge error is reviewed using the procedure
set out in Almanza.”).  In other words, a properly preserved error will
require reversal as long as the error is not harmless.  Almanza, 686
S.W.2d at 171.  In making this determination, “the actual degree of harm must
be assayed in light of the entire jury charge, the state of the evidence,
including the contested issues and weight of probative evidence, the argument
of counsel and any other relevant information revealed by the record of the
trial as a whole.”  Id.; see also Ovalle v. State, 13 S.W.3d 774,
786 (Tex. Crim. App. 2000).

B. 
Involuntary Act

          Farmer
argues that he did not intentionally or voluntarily take the Ambien, which he
apparently consumed when he took the pills that his wife had set out for him.[5] 
Therefore, he contends, an involuntary act is a defense in his case in that,
under the penal code, a person “commits an offense only if he voluntarily
engages in conduct.”  See Tex. Penal Code Ann. § 6.01(a) (Vernon 2003); Brown
v. State, 290 S.W.3d 247, 250–51 & n.1 (Tex. App.—Fort Worth 2009, pet.
ref’d); Peavey v. State, 248 S.W.3d 455, 465 (Tex. App.—Austin 2008,
pet. ref’d); Nelson, 149 S.W.3d at 211–12.

The court of criminal
appeals has described voluntary conduct as follows:

 

Voluntary conduct “focuses
upon conduct that is within the control of the actor.[”] . . .  Thus, before
criminal responsibility may be imposed, the actor’s conduct must “include[ ]
either a voluntary act or an omission when the defendant was capable of
action.” . . . [T]he “voluntary act” requirement does not necessarily go to the
ultimate act (e.g., pulling the trigger), but only that criminal
responsibility for the harm must “include an act” that is voluntary (e.g.,
pulling the gun, pointing the gun, or cocking the hammer).

 

          This Court
has repeatedly discussed the meaning of “accident” and “voluntary conduct” to
distinguish the two defensive theories. . . . 

 

‘[C]onduct [is not]
rendered involuntary merely because an accused does not intend the result of
his conduct.’  Therefore, the issue of the voluntariness of one’s conduct .
. . is separate from the issue of one’s mental state.

 

          . . . 

 

“Voluntariness,”
within the meaning of Section 6.01(a), refers only to one’s own physical body
movements.  If those physical movements are the nonvolitional result of
someone else’s act, are set in motion by some independent non-human force,
are caused by a physical reflex or convulsion, or are the product of
unconsciousness, hypnosis or some other nonvolitional impetus, that movement is
not voluntary.  The word “accident,” however, is a word of many meanings which
covers a wide spectrum of possibilities.  It generally means “a happening that
is not expected, foreseen, or intended.” . . .  [T]he word “accident” has not
been used to refer to an “involuntary act” under Section 6.01(a).

 

Rogers
v. State, 105 S.W.3d 630, 638–39 (Tex. Crim. App. 2003) (internal
citations  omitted) (emphasis added).  To assert “involuntary act” as a
defense, the defendant must produce “evidence of an independent event, such as
the conduct of a third party, that could have precipitated the incident.”  Rhodes
v. State, 997 S.W.2d 692, 694 (Tex. App.—Texarkana 1999, pet. ref’d)
(citing Brown, 955 S.W.2d at 280).

          We
observe that with regard to the “accident” language in Farmer’s requested
instruction, “a request for an instruction on ‘accident’ is no request at all .
. . .  [T]here is no longer any such defensive ‘accident’ theory which requires
a jury instruction.”  See Rogers, 105 S.W.3d at 640. 
Furthermore, involuntary intoxication is not a defense to DWI.  Brown,
290 S.W.3d at 250–51; Nelson, 149 S.W.3d at 211–12; Aliff v. State,
955 S.W.2d 892, 893 (Tex. App.—El Paso 1997, no pet.).  In Brown,
another misdemeanor-DWI case, part of the defense’s theory was that he had
mistakenly taken Ambien instead of his blood pressure medicine.  290 S.W.3d at
248.  We overruled his complaint about the trial court’s denial of his
involuntary intoxication instruction request because DWI does not have a
culpable mental state.  Id. at 250; see also Tex. Penal Code Ann.
§ 49.11(a) (Vernon 2003) (“[P]roof of a culpable mental state is not
required for conviction of an offense under this chapter.”).

          Because
DWI has no required proof of a mental state necessary for a conviction, it is a
conduct-oriented offense.  Nelson, 149 S.W.3d at 210.  In other words,
“I didn’t mean to drive while intoxicated” cannot preclude a conviction because
the statute merely requires that the accused be found to be intoxicated while
operating a motor vehicle, without reference to any intent of his part to
become intoxicated.  See Tex. Penal Code Ann. § 49.04 (Vernon 2003), § 49.11(a).
 On the other hand, if a third person causes the accused to become intoxicated,
such as by slipping a “mickie” in his drink or forcing him to take an
intoxicant and get behind the wheel, then the voluntary conduct defense is
available.  Cf. Brown, 290 S.W.3d at 248, 251 (holding no
involuntary intoxication when appellant took Ambien instead of his blood
pressure medicine when the Ambien pills were a different color and shape than
his blood pressure medicine).  These possible third party actions do not touch
on the accused’s mental state or intent, but rather on voluntariness.  Cf. Nelson,
149 S.W.3d at 208–09, 211–12 (holding no jury instruction required when
appellant knowingly and intentionally took the three different prescription
painkillers an hour before driving and knew their side effects from past
usage); Aliff, 955 S.W.2d at 892–93 (holding same when nothing in the
record indicated that appellant unknowingly took his prescription drugs for his
mental illness and back problems or that he took them without knowledge of
their effects).

          The
facts of this case do not squarely fit into one of the categories we have discussed—accident,
involuntary intoxication, or involuntary act.  However, we hold that it is most
closely akin to an involuntary act because the evidence suggests that although Farmer
voluntarily took the pills laid out for him by his wife, he involuntarily took
the Ambien pill because of his wife’s act.  Therefore, the trial court’s
denial of Farmer’s request for an instruction about the voluntariness of his
actions constituted some harm, in that it denied the accused of a defense that,
if believed by the jury, could have resulted in his acquittal.  See Brown,
955 S.W.2d at 279; Abdnor, 871 S.W.2d at 731–32; Almanza, 686
S.W.2d at 171.  We sustain Farmer’s sole point.

V.  Substance
of the Requested Instruction

          The
State argues that the trial court did not err by denying Farmer’s requested
instruction because the proposed instruction improperly commented on the weight
of the evidence.  The State does not point us to anywhere in the record to show
where the substance of the proposed instruction was considered and ruled on by
the trial court.  See Tex. R. App. P. 33.1(a).  The record reflects that
although the trial court reflected that the proposed instruction was “kind of a
comment” on the weight of the evidence, the State did not lodge this specific
objection and the parties did not argue the issue before the trial court.  Because
the issue of the proposed instruction’s content was not presented to,
considered by, or ruled on by the trial court and because on remand the parties
will have an opportunity to present and respond to arguments about, and the
trial court will consider and expressly rule on, the substance of the jury instruction
to be given, we express no opinion as to the substance of Farmer’s proposed
instruction as we find the issue unnecessary to resolve Farmer’s sole issue—whether
an instruction was warranted—and we further conclude that the State’s request
puts the issue of the instruction’s substance prematurely before us.

VI. 
Conclusion

          Having
sustained Farmer’s sole point, we reverse the trial court=s
judgment and remand this case for a new trial.

 

 

BOB MCCOY
JUSTICE

 

PANEL: 
DAUPHINOT,
WALKER, and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: 
April 28, 2011









[1]See Tex. R. App. P. 47.4.





[2]The charging instrument lists
Zolpiden and Tramadol as the controlled substances causing Farmer’s impairment.
 Tramadol is the generic name for Ultram, and Zolpidem is the generic name for
Ambien.





[3]The trial court took
judicial notice that Ambien is a drug specifically listed under Penalty Group 3
of the Controlled Substances Act.





[4]He
had not taken any pills from the Celebrex or Amatrix packets that the doctor
also gave to him.





[5]We note that taking
prescription drugs is not a defense to DWI when the accused voluntarily takes
medication that has effects that are known to him.  See Nelson v.
State, 149 S.W.3d 206, 211 (Tex. App.—Fort Worth 2004, no pet.).